UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED PRESCRIPTION SERVICES, INC.,

                Plaintiff,

v.                                                    CASE NO.: 8:06-CV-1977-T-30MAP

ALBERTO R. GONZALEZ, in his official
capacity as Attorney General, United States
Department of Justice, and KAREN TARDY,
in her official capacity as the Administrator
of the United States Drug Enforcement
Administration,

                Defendants.
_____/

## REPORT AND RECOMMENDATION

      United Prescription Services, Inc. ("UPSI"), a pharmacy whose business primarily involves distributing controlled substances via mail order, claims the Drug Enforcement Administration (DEA) has violated its due process rights by taking informal actions to dry up its sources of supply and put it out of business. Accordingly, it moves to preliminarily enjoin DEA from contacting its suppliers and taking action that would disrupt its access to controlled substances. After a lengthy hearing on the matter, I recommend the motion be denied because the UPSI has failed to state a cause of action for which relief can be granted; further, even if UPSI does allege some cognizable cause of action, it has failed to meet the prerequisites for injunctive relief.[1]

---

[1] United States District Judge James S. Moody Jr. referred this matter to me for issuance of a Report and Recommendation pursuant to 28 U.S.C. § 636.

*A. Factual background*

UPSI is a pharmacy registered with the DEA to dispense controlled substances in Schedules II-IV of the Controlled Substance Act (CSA). Initially specializing in servicing individuals who sought reimbursement for prescription medication from their automobile personal injury protection policies, it now operates as a full service pharmacy. However, unlike most brick and mortar pharmacies, UPSI is also licensed to compound drugs pursuant to a physicians's prescription, a service that patients and physicians depend upon when there is no commercially available alternative drug (doc. 1, exh. 1, Decker Aff. ¶¶ 3, 5). The majority of prescriptions that require UPSI's compounding services involve hydrocodone, a Schedule III narcotic. Although the parties disagree as to UPSI's classification as an "internet pharmacy," the evidence shows that UPSI receives a majority of its prescription refill requests via the internet, which are then filled and shipped to customers in 48 states.[2] The evidence also shows that a majority of the prescriptions UPSI fills for controlled substances are written by Dr. Robert Reppy, D.O., a pain management specialist in Tampa who practices telemedicine.[3]

According to Michael Mapes, DEA's Chief of E-commerce in Diversion Control, DEA developed a plan in the summer of 2005 to cut off the supply of controlled substances to

---

[2] DEA describes "internet pharmacies" are rogue pharmacies that receive prescription orders for controlled substances over the Internet, fill them and ship the orders to customers. DEA claims these pharmacies circumvent existing federal and state laws, regulatory protections, and the required doctor-patient relationship (UPSI Exh. 6).

[3] Florida defines telemedicine as the "prescribing of legend drugs to patients through the following modes of communication: (a) Internet; (b) Telephone; and (c) Facsimile." FLA. ADMIN. CODE. r. 64B8-9.014 (2006).

suspected "internet pharmacies."[4] The plan involved meeting with wholesalers, either at DEA's headquarters in Washington, D.C. or via a conference call, to remind the wholesalers of their duty under the CSA to only distribute controlled substances for legitimate purposes. According to Mapes, DEA initially targeted the largest wholesalers hoping DEA's self-policing message would trickle-down to the smaller wholesalers and distributors.

On January 6, 2006, DEA summoned representatives from McKesson Pharmaceuticals, one of UPSI's major suppliers, to Washington to discuss the volume of hydrocodone McKesson was shipping to some of its customers, including UPSI. At some point during the meeting, Rannazzisi asked the representatives from McKesson why DEA should not issue an immediate show cause order as a result of the company's failure to fulfil its responsibility in monitoring controlled substance; a question McKesson representatives perceived as a threat. Three days after the meeting, McKesson decided to stop shipping controlled substances to UPSI and subsequently informed UPSI by letter of its action commenting it had reached this conclusion after "being advised by the DEA that United Prescription [was] conducting business as an 'internet pharmacy'" (UPSI Exh. 3).

As part of its plan, DEA also notified distributors by email when a distributor restricted the supply of controlled substances to a pharmacy. For example, on November 28, 2005, Mapes informed distributors that an unnamed distributor had restricted the sale of controlled substances to six named pharmacies in Florida. Mapes specifically listed UPSI as one of the six. The email also told the recipients that if any of the pharmacies came to them for controlled substances, they

---

[4] Mapes testified that the plan was conceived by Joseph T. Rannazzisi, DEA's Deputy Assistant Administrator of Diversion Control.

should "remember the information that [they] discussed related to the types and quantities of drugs sold in [i]nternet pharmacies" (UPSI Exh. 2). On at least two other occasions, Mapes sent similar e-mails identifying UPSI as a pharmacy whose distributors had stopped or reduced sales of controlled substances to (UPSI Exh. 17, 18).

On February 6, 2006, a couple of months before UPSI renewed its application to dispense controlled substances (its registration was due to expire on May 31, 2006), DEA executed an administrative inspection warrant at UPSI premises and seized various documents, records and prescriptions (UPSI Exh. 5). DEA has not yet renewed UPSI's registration, and as a result, UPSI's registration has been effectively converted into a day to day license. *See* 21 C.F.R. § 1301.36(i). Consequently, distributors and wholesalers, who are required to verify UPSI's registration before filling an order, call the local DEA office every time UPSI places an order for controlled substances. According to UPSI's pharmacist-in-charge (Decker), this administrative quandary has caused two of its distributers (Dohmen Distribution Partners and Top Rx) to stop supplying controlled substances and hindered its efforts to secure other distributors (*see* UPSI Exh. 4).[5]

In June 2006, the DEA presented a Power Point presentation titled "Internet Diversion of Controlled Pharmaceuticals" at a national conference which identified UPSI as an internet pharmacy being targeted for diversion of controlled substances by DEA. *See* UPSI Exh. 6. DEA later posted this presentation on its diversion control website. UPSI claims that both actions, identifying it as being under investigation and posting the information on the Internet, violated

---

[5] Decker testified that a representative at Dohmen called the local DEA office so many times that a DEA representative asked her not to call back concerning UPSI's registration for at least a month.

4

the Department of Justice's policy prohibiting officials from commenting about ongoing investigations.[6] DEA eventually removed the presentation from its website at UPSI counsel's insistence.

Seven months after executing the administrative search warrant, DEA by letter demanded UPSI cease and desist manufacturing and dispensing compound medications without a DEA manufacturing registration (UPSI Exh. 7). In response, UPSI successfully filed an emergency motion for a temporary restraining order. *See United Prescription Services, Inc. v. Alberto Gonzales, et. al.*, 8:06-CV-1706-T-23-TGW, doc. 1-4, and UPSI Exh. 8. Before the scheduled preliminary injunction hearing, DEA withdrew its cease and desist order explaining DEA had received erroneous guidance from its headquarters (UPSI Exh. 9).

UPSI also claims that DEA has improperly pressured its suppliers by issuing informal and unpublished rulings. For example, DEA informed Cardinal Health, one of UPSI's suppliers, that a doctor must personally examine a patient before writing a valid prescription (doc. 1, ¶ 18).[7] UPSI contends this directly violates previously published guidelines from the DEA and was informally issued without providing notice or an opportunity to comment on the

---

[6] See United States Attorneys Manual 1-1.700 *et. seq*. The guidelines contained in the manual govern the release of information relating to criminal and civil cases and all matters by all components (FBI, DEA) and personnel of the Department of Justice. However, the guidelines also state that they do not create any rights enforceable in law or otherwise in any party. *See* United States Attorneys Manual 1-7001.

[7] According to a letter from Cardinal Health, DEA informed them that a prescribing physician must conduct a physical examination on a patient before a valid prescription can be written for controlled substances, such as hydrocodone. Since UPSI filled prescriptions written by doctors who had not conducted physical examinations on their patients, Cardinal decided to discontinue controlled substance shipments to UPSI (doc. 1-7).

rule change as required by the Administrative Procedure Act.[8]  Although Cardinal states it based its decision not to supply UPSI on information it received from DEA in August 2005, Cardinal waited until October 5, 2006, to discontinue its shipments to UPSI (doc 1-7).  Since then, UPSI claims that it has been unable to secure a viable supplier of controlled substances  (doc. 1-6, ¶ 6).

*B.  Discussion*

A district court may issue a preliminary injunction if the plaintiff shows: (1) it has a substantial likelihood of succeeding on the merits of the underlying case; (2) irreparable injury during the pendency of the suit will be suffered unless the injunction issues immediately; (3) the threatened injury to the plaintiff outweighs whatever damage the proposed injunction may cause the defendant; and (4) if issued, the injunction would not be adverse to the public interest. *Alabama v. U.S. Army Corps of Engineers,* 424 F.3d 1117, 1128 (11th Cir. 2005).  But at the outset, the plaintiff must rest its demand for such an extraordinary remedy upon a viable cause of action.  Namely, "[f]or a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6) (failure to state a claim)." *Id.* at 1127 (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004)).  The "remedy is potentially available only after a plaintiff can make a showing that some independent legal right is being infringed – if the plaintiff's rights have not been violated, [it] is not entitled to any relief, injunctive or otherwise." *Id.*  And even if the plaintiff shows a violation of a cognizable right, the remedy is

---

[8] *See also* 21 C.F.R. § 1306.04(a) (2006)(requiring that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice)

only appropriate if there is no adequate legal remedy for that wrong and an irreparable injury will result if the injunction does not issue. *Id.*

### 1. *Likelihood of success on merits*

Two events have merged to choke off UPSI's supply of controlled substances: DEA's jawboning and DEA's delay in approving UPSI's for renewal registration.[9] While UPSI complains vociferously about DEA's regulatory arm-twisting, it conceded at the preliminary injunction hearing DEA's right of license review (although it seemingly argues DEA should have automatically renewed its license). Regardless, neither event provides the UPSI with a cognizable legal basis for attack, and if a legal basis arguably exists, UPSI has not made a showing that it is likely to prevail on the merits of its claim.

### *a. administrative arm-twisting*

UPSI's principal complaint focuses on DEA's effective backroom, administrative arm-twisting: "… DEA now has attempted to create a *de facto* cease and desist order, depriving UPSI of its right to formulate, dispense, and maintain controlled substances by pressuring UPSI's suppliers to cease supplying UPSI with such products." (doc. 1, ¶ 17). Such tactics are neither new nor unexpected. "Regulation through 'raised eyebrow' techniques or forceful jawboning is commonplace in the administrative context," and its approval largely depends on which end of the regulatory stick one faces: "praised as effective leadership by those satisfied with its results or condemned as unprincipled administration by those who disapprove of those results." *Writers Guild of America, West, Inc. v. American Broadcasting Co., Inc.,* 609 F.2d

---

[9] "Jawboning" refers to a policy, first associated with the administration of President Lyndon Johnson, of urging management and union leaders to adopt a policy of restraint in wage and price negotiation. OXFORD ENGLISH DICTIONARY ONLINE (2006).

355, 364-65 n. 8 (9th Cir. 1979) (refusing to give declaratory and injunctive relief to plaintiffs complaining about Federal Communications Commission's jawboning television networks to adopt a system of self-regulation that would reduce the amount of sex and violence in television programming without the need for any "formal" FCC action and citing numerous cases where courts have refused to prohibit arm-twisting conduct); *see also,* Lars Noah, *Administrative Arm-Twisting in the Shadow of Congressional Delegations of Authority*, 1997 WIS. L. REV. 873 (1997). All this makes the line between permissible regulatory activity and impermissible arm-twisting "exceedingly vague." *Writers Guild,* 609 F.2d at 365. Thus, when asked to control such actions, a court should wade into the mix with sensitivity to "the particular regulatory context in which it occurs, the interests affected by it, and the potential for abuse." *Id.* (citing *Consolidated Edison Co. v. Federal Power Commission,* 512 F.2d 1332, 1341 (D.C. Cir. 1975)).[10]

UPSI operates in a highly regulated industry, subject to both federal and state controls, and has purposely carved a niche within a strictly regulated segment of that industry, dispensing controlled substances. The CSA, with its complimentary regulatory scheme, provides oversight and enforcement aimed at preventing and reducing the diversion of controlled substances from their intended recipients to those bent on using the drugs for abusive, illicit, or unauthorized purposes. *See* 21 U.S.C. § 801 (setting out Congressional findings and declarations seeking to balance medical need for controlled substances with their potential harm if improperly used); *Wedgewood Village Pharmacy, Inc. v. Ashcroft,* 293 F. Supp. 2d 462, 466 (D.N.J. 2003).

---

[10] Courts may be more likely to restrict regulation by informal means where first amendment values are at stake rather than purely economic interests. *See Consolidated Edison,* 512 F.2d at 1341 n. 54.

Accordingly, registrants must prepare and maintain records accounting for the receipt, storage, and distribution of controlled substances, a requirement that applies throughout the distribution chain (namely, manufacturers, distributors, dispensers, importers, and exporters). *See* 21 C.F.R. § 1301.11. This allows DEA to monitor the flow of controlled substances and imposes a concomitant duty on a registrant, like UPSI or its supplier, to self-police. *See* 21 U.S.C. § 822(b) (registrants are required to dispense controlled substances in conformity with registration and other provisions of CSA); *Wedgewood Village* 293 F. Supp. 2d at 466-67.

Beginning in mid 2005, DEA implemented a multi-pronged approach for dealing with what it and Congress perceived to be a national problem – the dispensing of controlled substances by "internet pharmacies" circumventing regulatory oversight. Although, UPSI forcefully argues it is not an "internet pharmacy" and should not be lumped with "rogue pharmaceutical web sites," its business model relies on physicians who primarily derive their patient base through the Internet and who operate outside the classic patient-doctor relationship. With its patient profile and overwhelming ratio for distributing controlled substances over non-controlled substances, UPSI matched DEA's target of regulatory concern. And DEA made McKesson and Cardinal, two large suppliers of hydrocodone and UPSI's chief suppliers, aware of those regulatory concerns by explicitly warning both to self-police their business practices in accordance with the Act's goals.

Despite UPSI's distribution profile and a supplier's duty to self-regulate, UPSI strenuously argues DEA has denied it due process. Yet, it omits citing in its papers any persuasive legal authority for its claim; likewise, it fails to allege the specific due process violation at issue, procedural or substantive. At the preliminary injunction hearing, UPSI's

counsel argued DEA's backroom intimidation amounted to a "taking" of its property interests. While DEA may have effectively limited UPSI's access to large supplies of controlled substances, it did not take any property interest implicating UPSI's Fifth Amendment due process rights. For example, DEA has not suspended or revoked UPSI's registration; UPSI can and does dispense controlled substances. *See Bell v. Burson,* 402 U.S. 535, 539 (1971) (suspension of issued license amounts to state action implicating property interests); *Foxy Lady, Inc. v. City of Atlanta,* 347 F.3d 1232, 1236 (11th Cir. 2003) (same); *see also Wedgewood Village Pharmacy,* 293 F. Supp. 2d at 469-71 (recognizing that depriving pharmacy of its rights to dispense and receive controlled substances without notice and a hearing would violate due process). In short, UPSI's real complaint is that DEA has compromised its ability to do business as it had done before the backroom tactics. Fewer suppliers are willing to do business with it, and those that are can only supply it with lesser quantities of hydrocodone. UPSI's argument avoids the realities of the regulatory context. It also ignores the realities of the distribution chain and the Act's imposition on all registrants to monitor its distribution of controlled substances: namely, that some of its suppliers, presumably acting on their own self-interests, have decided not supply UPSI with controlled substances. USPI's position is really no different than that of the actors, writers, and directors in *Writers Guild* who unsuccessfully complained about the FCC's jawboning of network executives to self-police the network's programs – non-governmental forces (network executives or hydrocodone wholesalers) have directly hampered the complainant's ability (at least as the complainant perceives what that ability should be) to serve its market. Self-policing by those regulated can be effective and salutary, and courts give statutorily charged agencies leeway in carrying out their assigned

regulatory tasks.  *See Writers Guild,* 609 F.2d at 366 ("The Commission, as the expert agency entrusted by Congress with the administration and regulation of the crucial, dynamic communications field, required and deserves some latitude in carrying out its substantial responsibilities.").  UPSI has not shown DEA's jawboning tactics crossed the line toward a cognizable constitutional violation, much less violated one.

### *b. license renewal*

If DEA's arm-twisting squeezed UPSI's controlled substance supply line, DEA's refusal to automatically renew UPSI's registration tightened the grip.  When UPSI renewed its application with DEA for dispensing controlled substances, it knew or should have known that DEA would reevaluate its business model to determine if renewal would be inconsistent with the public interest.  *See* 21 U.S.C. § 823 (setting out requirements and setting out factors to be considered); 21 C.F.R. §§ 1301.31 and 1301.13.  By then, DEA had already expressed concern about UPSI's distribution practices.  And it should have anticipated that DEA would place an administrative hold on its application (a "code 6").  *See Wedgewood Pharmacy,* 293 F. Supp. 2d at 465 (explaining "code 6").  Likewise, UPSI should have similarly predicted its current administrative limbo, a day-to-day licensing until DEA orders otherwise.  *Id.*; 21 C.F.R. § 1301.36(i). Yet, these developments do not give rise to a justiciable cause of action, and UPSI's reliance on two provisions of the Administrative Procedures Act, 5 U.S.C. §§ 704 and 705, do not offer it jurisdictional cover.[11]

---

[11] UPSI's dilemma is similar to *Wedgewood Pharmacy*.  A significant majority of Wedgewood's business, like UPSI's, dealt with dispensing compounds that contained controlled substances.  And, like UPSI, its customers were mainly mail-order.  When its business grew and it needed a larger plant, Wedgewood applied for a modification of its registration.  This triggered administrative review under 21 U.S.C. § 823.  DEA, concerned that Wedgewood was operating

Section 704 provides judicial review for final agency action for which there is no other adequate remedy in a court. Determining finality depends on five factors: (1) whether the agency action constitutes the agency's definitive position; (2) whether the action has the status of law or affect the legal rights and obligations of the parties; (3) whether the action will have an immediate impact on the daily operations of the regulated party; (4) whether pure questions of law are involved; and (5) whether pre-enforcement review will be efficient. *Tennessee Valley Authority v. Whitman,* 336 F.3d 1236, 1248 (11th Cir. 2003). USPI applies none of these factors, and none coalesce in its favor. *Id.* (to be a final action it must "mark the consummation of the agency's decision making process" and determine "the rights or obligations" from which "legal consequences will flow"quoting *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997)). Although DEA has not yet issued UPSI a show cause order, DEA's counsel at the preliminary injunction hearing indicated he would recommend such action to his superiors. If such an order is issued, UPSI will be entitled to an administrative hearing. *See* 21 C.F.R. §§ 1301.37 and 1301.41, *et seq.* In short, UPSI has not persuasively argued that DEA's conduct amounts to a final agency action as contemplated by § 704 so as to give this Court jurisdictional review.

---

as an unregistered manufacturer, placed a "code 6" pending further investigation. Eventually, DEA issued an administrative order to show cause why Wedgewood's application should not be denied. *See* 21 U.S.C. § 824(c); 21 C.F.R. § 1301.37. Faced with an inability to do business as it had done before, Wedgewood sought to preliminarily enjoin DEA from preventing it from dispensing controlled substances at its new facility until a final resolution of the order to show cause. As grounds for its action, Wedgewood claimed DEA had violated its due process rights by acting arbitrarily and capriciously in failing to immediately approve its application. The court denied the motion finding DEA acted within its regulatory discretion by subjecting Wedgewood to the full administrative process.

Section 706 provides courts with the statutory authority to review a claim that an agency has unreasonably delayed or unlawfully withheld agency action. UPSI has not stated why this Court should take action under the section other than to imply its application by asserting DEA's under-the-table and above-the-table actions will put it out of business unless some quick determination is made (presumably in its favor). Because it cannot survive the predicted delay for an administrative adjudication, UPSI relying § 706 contends this Court is its only recourse for relief. What UPSI is really asking for, while not stating so succinctly, is a writ of mandamus directing the DEA to act and renew its application or provide a speedy administrative review. Admittedly, the APA directs agencies to conclude matters presented to them within a reasonable time and stipulates a reviewing court shall compel agency action unlawfully withheld or unreasonably delayed, but a litigant seeking judicial interlocutory review must pass a "high" threshold. *See Telecommunications Research and Action Center v. FCC,* 750 F.2d 70, 79 (D.C. Cir. 1984). A fundamental step in crossing that threshold is for the litigant to show unreasonable delay.

Administrative agencies enjoy broad discretion in applying their resources to regulatory tasks, but that discretion is not unbounded, as the "consequences of dilatoriness may be great." *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987). Thus, the time table for administrative proceedings must be governed by a "rule of reason." *Id*. In determining the reasonableness of a delay, courts should consider several factors: (1) "the length of time that has elapsed since the agency came under a duty to act," (2) "the reasonableness of the delay … judged in the context

of the statute which authorizes the agency's action;"[12] and (3) "the consequences of the agency's delay."[13] *Id.* at 897-98 (internal citations and quotations omitted). Courts also take an agency's justifications for delay into consideration, but any justification will "become less persuasive as the delay progresses." *Id.* at 898. Applying these factors, UPSI has not shown DEA has acted dilatory. UPSI filed the current action less than five months after DEA's duty to act on its registration arose. In May 2006, both sides, commendably but unsuccessfully, attempted to reach a "resolution" of the matter. Nonetheless, the regulatory scheme does not require DEA to make registration renewal decisions in a set time period. *See* 21 C.F.R. § 1301.36(i) (when the Administrator has issued no order on the application for renewal, the existing registration continues until the date on which the Administrator so issues his/her order). Besides, UPSI has not really complained that DEA has delayed its review; instead UPSI argues any delay, other an immediate decision in its favor, will put it out of business. That unfortunate consequence does not, however, justify judicial interlocutory review, particularly when Congress has charged a specific agency with primary consideration of the subject matter.

### 2. *Other preliminary injunction factors*

Even if UPSI could arguably show likely success on the merits, it fails to meet the remaining demands for injunctive relief. For example, UPSI claims it will suffer irreparable injury unless DEA makes a quick decision on its registration. The court in *Wedgewood*

---

[12] This requires "an examination of any legislative mandate in the statute and the degree of discretion given the agency by Congress." *Cutler*, 818 F.2d at 897.

[13] "The deference traditionally accorded an agency to develop its own schedule is sharply reduced when injury likely will result from avoidable delay. Economic harm is clearly an important consideration and will, in some cases, justify court intervention." *Cutler*, 818 F.2d at 898.

*Pharmacy* faced and rejected the claim of financial ruin: "As unpleasant and unattractive as that may be, Wedgewood's inability to fill controlled substance prescriptions is largely a product of its own doing and the harm, as grave as it may be, does not counsel in favor of granting the injunction." *Wedgewood*, 293 F. Supp. 2d at 475.   UPSI's position is no different.

Balancing the threatened economic injury to UPSI against DEA's statutory duty to control the diversion of controlled substances must also be considered.  Clearly, the economic harm to UPSI is substantial; however, DEA's need for discretion carrying out its statutory mandate is more pressing.  Forcing DEA to act at this early stage of its investigation sends an inappropriate signal to those it regulates and undermines DEA's discretion and ability to attempt informal settlements with registrants.

Lastly, Congress granted DEA control over a highly regulated industry and charged it to act in the interest of public safety.  UPSI's main interest, although it serves a community in need of compounded medications, is understandably to continue its profitable operation.  When these government and private interests collide in highly regulated industries, prudence requires that "private litigants … give way to the reasonable attainment of public purposes."  *Id*.  And the distribution of controlled substances in accordance with the stated goals of the CSA promote public safety and welfare.

*C.  Conclusion*

For the reasons discussed above, I recommend the motion for preliminary injunction be denied.

_____
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

15

## NOTICE TO PARTIES

      Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attaching on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982)(*en banc*).

cc:    Hon. James S. Moody, Jr.
        Plaintiff
        Defense Counsel